## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adreana Rodriguez, *individually and on behalf of all others similarly situated*,<br><br>          Plaintiff,<br><br>          -v-<br><br>Festival Fun Parks, LLC d/b/a Palace Entertainment,<br><br>          Defendant. | 2:24-cv-1245<br>(NJC) (ARL) |

## MEMORANDUM AND ORDER

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiff Adreana Rodriguez ("Rodriguez") brings this putative class action against Festival Fun Parks LLC d/b/a Palace Entertainment ("Festival") under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). (Compl., ECF No. 1.) Rodriguez alleges that Festival failed to disclose certain processing fees attendant to ticket sales for Festival's Splish Splash amusement park in the manner required under New York Arts and Cultural Affairs Law § 25.07. (*Id.*) Festival has filed a Motion to Compel Arbitration ("Motion") pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 3, seeking to compel arbitration of Rodriguez's claim pursuant to an arbitration agreement between the parties. (Def.'s Mot., ECF No. 6.) For the reasons set forth below, the Motion is denied.

## BACKGROUND

In order to evaluate Festival's Motion, I consider the Complaint as well as "all relevant, admissible evidence submitted by the parties," and I draw all reasonable inferences in favor of Rodriguez, the non-moving party. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir.

2019). Unless otherwise noted, the parties do not dispute following facts for the purpose of this Motion. (*See* Def.'s Mot.; Pl.'s Opp'n, ECF No. 9.)

## I.     The Complaint

Festival owns and operates an amusement park named Splish Splash in Calverton, New York. (Compl. at ¶ 8.)[1] Festival sells admissions tickets to Splish Splash through its website, https://www.splishsplash.com/. (*Id.* ¶ 7.) The website's homepage features a "Buy Tickets" button that, when clicked, redirects the user to another page in which the user can select either a "season pass" or a "day ticket" ("Water Park Tickets page") (*Id.* ¶ 10.) The Complaint includes the following images of the Splish Splash homepage and "Water Park Tickets" page:



---

[1] The Complaint alleges that Festival owns and operates amusement parks throughout the United States, including Splish Splash. (Compl. ¶ 8.) In its Motion, Festival states "that Splish Splash is a stand-alone water park, with no other locations in [New York] or any other [state]." (Def.'s Mot. at 4.) To the extent that these facts are disputed, they are not material to the resolution of Festival's Motion.





(*Id.* ¶¶ 9–10.)

The Water Park Tickets page states that the cost of "[a]ny [d]ay [t]icket" is "[a]s low as $59.99." (*Id.* ¶ 10.) This page does not list any fees associated with the ticket price. (*Id.*) Underneath the day ticket option is a button labeled "Buy Now" that, when clicked, redirects the user to a third page, which also displays the price of a day ticket as "$59.99" and along with buttons that allow the user to select the number of day tickets to purchase ("Day Ticket selection page"). (*Id.* at 10–11.) The Complaint includes the following image of the Day Ticket selection page:



(*Id.* ¶ 11.)

Once the user clicks "continue" on the Day Ticket selection page, the website redirects

the user to a checkout page, which displays the ticket price as $59.99 as well as a $4.00

processing fee per ticket (the "checkout page"). (*Id.* ¶ 12.) The Complaint includes the following

screenshot of the checkout page:



**Figure 4**

(Compl. ¶ 12.) On the left side of this page, about halfway down, there is a light blue rectangle inside of which are four hyperlinked terms in dark blue font: "Privacy Policy," "Operating Rules," "Terms&Conditions," and "ADA Accessibility." (*Id.*)[2]

On or around June 5, 2023, Rodriguez purchased four day tickets to Splish Splash through its website. (*Id.* ¶ 7.) During the purchasing process, she viewed webpages that were "substantially similar" to those described above. (*Id.* ¶ 7.) As in the process described above,

---

[2] Excerpts from the parties' submissions are reproduced here exactly as they appear in the original. Unless otherwise noted, errors in spelling, punctuation or grammar will not be corrected or highlighted.

Rodriguez was charged a processing fee for each ticket she purchased. (*Id.* ¶ 28 & n.3.)[3] On February 16, 2023, Rodriguez filed the Complaint in this action on behalf of herself and similarly situated individuals, alleging that in selling tickets to Splish Splash through its website, Festival violated New York Arts and Cultural Affairs Law ("N.Y. Arts & Cult. Aff. Law") § 25.07, which requires the operator of a place of entertainment to display the total cost of a ticket, including "all ancillary fees," in "the ticket listing prior to the ticket being selected for purchase." N.Y. Arts & Cult. Aff. Law § 25.07(4); *see also* Compl. ¶¶ 10, 22–29.[4]

---

[3] When Rodriguez purchased tickets in July 2023, she was charged a processing fee of $2.50 per ticket, but the processing fee charged on the Splish Splash website has since increased to $4 per ticket. (Compl. ¶ 28 n.3.)

[4] New York Arts and Cultural Affairs Law § 25.07(4) provides in its entirety:

> Every operator or operator's agent of a place of entertainment, any licensee or other ticket reseller, or platform that facilitates the sale or resale of tickets shall disclose the total cost of the ticket, inclusive of all ancillary fees that must be paid in order to purchase the ticket, and disclose in a clear and conspicuous manner the portion of the ticket price stated in dollars that represents a service charge, or any other fee or surcharge to the purchaser. *Such disclosure of the total cost and fees shall be displayed in the ticket listing prior to the ticket being selected for purchase.* Disclosures of subtotals, fees, charges, and any other component of the total price shall not be false or misleading, and may not be presented more prominently or in the same or larger size as the total price. The price of the ticket shall not increase during the purchase process, excluding reasonable fees for the delivery of non-electronic tickets based on the delivery method selected by the purchaser, which shall be disclosed prior to accepting payment therefor. Nothing in this subdivision shall be construed to nullify, expand, restrict, or otherwise amend or modify now existing laws or regulations outside of this article, and nothing in this subdivision shall be construed as making lawful any fraudulent, deceptive, or illegal act or practice that is unlawful pursuant to now existing laws or regulations.

N.Y. Arts & Cult. Aff. Law § 25.07(4) (emphasis supplied).

## II.    Motion to Compel Arbitration

On April 5, 2024, Festival filed its Motion to Compel Arbitration under 9 U.S.C. § 3. (Def.'s Mot.)[5] Festival contends that Rodriguez's claim must be arbitrated pursuant to an arbitration clause contained in the terms and conditions of her purchase. (*Id.* at 4.) According to Festival, in order to purchase a ticket through the Splish Splash website, a customer must select the particular ticket she wishes to purchase. (*Id.* at 5.) Festival asserts that this selection starts the ticket purchase process, which spans a total of five webpages before the customer is prompted to pay for the selected ticket. (*Id.* at 5.)[6] Festival contends that throughout the purchase process, the customer is presented with the "Splish Splash Terms & Conditions" (the "Terms"), which are hyperlinked at the bottom of each page. (*Id.* (citing Compl. ¶ 12).) In support of its Motion, Festival submitted an affirmation by attorney Purumei Kim ("Kim" and "Kim Affirmation"), which attaches a copy of the Terms. (Kim Affirm., ECF No. 6-2 at 1–2; Splish Splash Terms & Conditions, ECF No. 6-2 at 4–22.)[7]

The Terms provide that they apply to "all Services" which include, among other things, "the purchase of tickets to theme parks" operated by Festival. (Splish Splash Terms & Conditions § 1.) The Terms provide that "BY USING THE SERVICES, YOU AGREE TO BE BOUND BY THESE TERMS." (*Id.*) At the top of the Terms, the following paragraph appears:

---

[5] Festival filed a request for oral argument on this Motion. (ECF No. 6-1.) I do not find that this case would benefit from oral argument and deny the request.

[6] Festival did not attach pictures of any of these five pages and does not dispute the accuracy of the pictures included in the Complaint.

[7] The Terms do not contain internal pagination, so all references to the Terms will use the pagination generated by ECF for the Terms attached to the Kim Affirmation, which are docketed as ECF No. 6-2.

**IMPORTANT NOTICE: THESE TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER. IT AFFECTS YOUR LEGAL RIGHTS AS DETAILED IN THE ARBITRATION AND CLASS ACTION WAIVER SECTION BELOW. PLEASE READ CAREFULLY.**

(*Id.* at 4.) The mandatory arbitration provision is set forth in Section 14 of the Terms. (*Id.* § 14.) It provides that, before initiating a lawsuit or arbitration, the "parties shall use their best efforts to settle any dispute, claim, question, or disagreement and engage in good faith negotiations." (*Id.* § 14(a).) If the parties do not reach an agreement within thirty days of beginning those negotiations, the Terms provide, in relevant part, the following:

> [E]ither party may initiate binding arbitration as the sole means to resolve claims, subject to the terms set forth below. *Specifically, all claims arising out of or relating to these Terms* (including their formation, performance, and breach), the parties' relationship with each other and/or your use of the Services, *including your purchase or use of Tickets, shall be finally settled by binding arbitration* administered by JAMS in accordance with the provisions of its Streamlined Arbitration and Procedures, excluding any rules or procedures governing or permitting class or representative actions.

> Except as set forth in herein, *the arbitrator*, and not any federal, state or local court or agency, *shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms, including, but not limited to* any claim that all or any part of these Terms are void or voidable, *whether a claim is subject to arbitration*, and any dispute regarding the payment of JAMS administrative or arbitrator fees (including the timing of such payments and remedies for nonpayment). The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The parties agree that the arbitrator may allow the filing of dispositive motions if they are likely to efficiently resolve or narrow issues in dispute. The arbitrator's award shall be written, and binding on the parties and may be entered as a judgment in any court of competent jurisdiction. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration . . . .

> The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some

> instances, the costs of arbitration could exceed the costs of litigation and the right
> to discovery may be more limited in arbitration than in court.

(*Id.* § 14(b) (emphasis supplied).) Section 14 provides customers with the ability to opt out "and
not be bound by the arbitration . . . provision[]" by sending Festival written notice of the decision
to opt out within 30 days of the customer's "first use of the Services." (*Id.* § 14(f).)

The Terms also include a waiver of the right to bring a representative action, which
provides the following:

> The parties further agree that any arbitration shall be conducted in their individual
> capacities only and not as a class action or other representative action, and the
> parties expressly waive their right to file a class action or seek relief on a class
> basis. **YOU AND PALACE [FESTIVAL] AGREE THAT EACH MAY
> BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS
> INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS
> MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE
> PROCEEDING.** If this specific paragraph is found unenforceable, then the entire
> "Binding Arbitration and Class Action Waiver" section will be null and void. If
> there is a final judicial determination that applicable law precludes enforcement of
> this paragraph's limitations as to a particular remedy or form of relief ("Remedy
> Not Subject to Arbitration"), then that Remedy Not Subject to Arbitration (and
> only that Remedy not subject to Arbitration) must be severed from the arbitration
> and may be sought in court. The parties agree, however, that any adjudication of
> Remedies Not Subject to Arbitration shall be stayed pending the outcome of any
> arbitrable claims and remedies.

(Splish Splash Terms & Conditions § 14(d).) The opt-out provision in Section 14(f) applies to
the class action waiver provision as well as the arbitration provision. (*Id.* § 14(f).)

While the Terms attached to the Kim Affirmation indicate that they were "Last Updated"
on "August 7, 2023" (*id.* at 4), Festival asserts that "[o]n June 5, 2023, when Plaintiff purchased
the tickets, the Arbitration and Class Action Waiver provision contained in the Agreement was in
full force and effect." (Def.'s Mot. at 9 (using the term "Agreement" to refer to the Terms).) Kim
affirmed that the Terms attached to the Kim Affirmation are "a true and accurate copy of the

Splish Splash Terms & Conditions, that were in place during the relevant time period." (Kim Affirm. at 2.)

On March 27, 2024, after Rodriguez filed the Complaint in this action, Festival served Rodriguez with a demand for arbitration, which is attached as an exhibit to the Kim Affirmation. (Kim Affirm. at 15–22 ("Arbitration Demand").) In the Arbitration Demand, Festival states that, when Rodriguez purchased tickets on the Splish Splash website, she agreed to be bound by the Terms, including the arbitration provision. (*Id.* at 21.) Festival further advised that filing the instant action triggered the arbitration and class action waiver provisions and required Rodriguez to participate in arbitration administered by JAMS. (*Id.*)

On May 3, 2024, Rodriguez opposed Festival's Motion. (Pl.'s Opp'n, ECF No. 9.) Rodriguez argues that she is not bound by the Terms, including the mandatory arbitration provision, because the hyperlink to the Terms on the Splish Splash website did not give her reasonably conspicuous notice that by purchasing Splish Splash tickets, she would be bound by those Terms. (Pl.'s Opp'n at 2–9.) On May 10, 2024, Festival filed its reply. (Def.'s Reply, ECF No. 12.)[8]

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the Complaint alleges a class action

---

[8] Rodriguez moved to strike the following language from Festival's reply: "This firm had previously reached out to counsel for Plaintiff to offer any and all damages owed to her under the statute, which has been rejected. As such, the only reason Plaintiff brings this action is an attempt to extort Splish Splash." (ECF No. 12 (citing Reply at 4).) Festival did not oppose this motion (ECF No. 13), and Magistrate Judge Arlene R. Lindsay granted Rodriguez's Motion to Strike and held that "the Court will not consider the language challenged by Plaintiff." (Elec. Order, Sept. 23, 2024.) Accordingly, the Court does not consider these sentences of Festival's reply when deciding this Motion.

"involving (1) 100 or more class members, (2) an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs, and (3) minimal diversity, *i.e.*, where at least one plaintiff and one defendant are citizens of different states." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 56 (2d Cir. 2006); 28 U.S.C. § 1332(d)(2), (5)(B), (6).

First, the Complaint alleges a class of 100 or more members by alleging classes of people who purchased Splish Splash tickets through its website after August 29, 2022, and that Festival has "sold at least 100,000 tickets" to Splish Splash "through its website" during that period. (Compl. ¶¶ 3–4, 15).[9] Second, the Complaint alleges that the amount in controversy exceeds $5 million by alleging that Festival is liable for a "minimum of fifty dollars in statutory damages for each" of the at least 100,000 tickets sold through its website during that time. *Id.* ¶ 4; *see also* N.Y. Art. & Cult. Aff. L. § 25.33 ("[A]ny person who has been injured by reason of a violation of this article may bring . . . an action to recover his or her actual damages or fifty dollars, whichever is greater . . . .").

Third, Rodriguez has established that there is minimal diversity between the parties because Rodriguez is a citizen of New York and Festival is a citizen of Delaware and Pennsylvania. While the Complaint alleges only that Rodriguez is a "resident" of New York (Compl. ¶ 7), Rodriguez submitted an affidavit in response to this Court's Order to Show Cause, in which she attests that she is a lifelong resident of New York State, is registered to vote in New York, has a New York driver's license, has a vehicle registered in New York, homeschools her children in New York, receives food stamps from New York, pays taxes to New York, and sees doctors and a dentist in New York. (ECF No. 17; *see also* Order to Show Cause, Dec. 19, 2025.)

---

[9] The Complaint alleges a nationwide class and a New York subclass. (Compl. ¶¶ 15–16.)

Rodriguez has therefore established that she is domiciled in New York because New York is "the place where [she] has [her] true fixed home and principal establishment, and to which, whenever [s]he is absent, [s]he has the intention of returning." *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 53 (2d Cir. 2019). Rodriguez is therefore a citizen of New York.

The Complaint alleges that Festival "is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania." (Compl. ¶ 8.) Under CAFA, an "unincorporated association" is "deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10). CAFA does not define the term "unincorporated association," and the Second Circuit has not ruled on whether the term encompasses limited liability companies ("LLCs"). *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016). Several other circuits, as well as district courts in the Second Circuit, however, have determined that an LLC is an unincorporated association under CAFA. *See, e.g., Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 700 (4th Cir. 2010); *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1237 n.1 (10th Cir. 2015); *Erie Ins. Exchange v. Erie Indem. Co.*, 722 F.3d 154, 161 (3d Cir. 2013); *Davis v. HSBC Bank Nevada, N.A.*, 557 F.3d 1026, 1032 n.13 (9th Cir. 2009). The Court adopts the reasoning of the Tenth and Fourth Circuits and finds that Festival, as an LLC, is an unincorporated association under 28 U.S.C. § 1332(d)(10). Accordingly, because the Complaint alleges that Festival "is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania," the Complaint has sufficiently alleged that Festival is a citizen of Delaware and Pennsylvania under 28 U.S.C. § 1332(d)(10). (Compl. ¶ 8.)

Because Rodriguez has established that she and Festival are citizens of different states, she has established minimal diversity under CAFA. 28 U.S.C. § 1332(d)(2)(A).

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the alleged events took place in the Eastern District of New York. (Compl. ¶ 6.)

## STANDARD OF REVIEW

When deciding a motion to compel arbitration pursuant to the FAA, courts "apply a standard similar to that applicable for a motion for summary judgment." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022) (quotation marks omitted). "If the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law" courts "may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.*; *see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011). Where "there is an issue of fact as to the making of the agreement for arbitration," however, "then a trial is necessary." *Zachman*, 49 F.4th at 101; 9 U.S.C. § 4.

## DISCUSSION

### I.    Legal Standards

#### a.    Arbitration Agreements under the Federal Arbitration Act

Under the FAA, a written agreement to arbitrate disputes is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects a "liberal federal policy favoring arbitration agreements" that is "founded upon a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes." *Starke*, 913 F.3d at 288 (citations and brackets omitted). Despite this policy favoring arbitration, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). Arbitration "remains a creature of contract," and courts deciding a motion to compel arbitration must, as a threshold matter, determine "whether the parties to a contract have agreed to arbitrate disputes."

13

*Starke*, 913 F.3d at 288. "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 101–02. "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid." *Id.* (quotation marks and brackets omitted).

      b. <u>Choice of Law</u>

The question of whether the parties have agreed to arbitrate their disputes is determined by state contract law principles. *Starke*, 913 F.3d at 288. Here, the parties agree that New York law governs this question. (Def.'s Mot. at 11; Pl.'s Opp'n at 9.) "Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (quotation marks omitted); *see also Starke*, 913 F.3d at 288 (applying New York law to determine whether the parties agreed to arbitration based on the parties' agreement that New York contract law applied). I therefore apply New York law in determining whether Rodriguez agreed to the arbitration provision in the Splish Splash Terms.

      c. <u>Web-Based Contract Formation</u>

To form a contract under New York law, there must be "a manifestation of mutual assent" that is "sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke*, 913 F.3d at 288 (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050 (N.Y. 1999); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 417 N.E.2d 541 (N.Y. 1981)).

With respect to the formation of consumer contracts online, the Second Circuit has "recognized that an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online" than it does in traditional forms of commerce, because in

online transactions, "terms are usually unnegotiated and consumers often proceed without reading the fine print." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023).[10] In the context of an online transaction where an offeree does not have "*actual* notice of contractual terms," the individual is nevertheless bound by such terms where "(1) a reasonably prudent person would be on *inquiry notice* of the terms and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Id.* at 703 (quotations marks and alterations omitted); *see also Starke*, 913 F.3d at 288 (applying New York law).

With respect to the first requirement—inquiry notice to a reasonably prudent person—courts have described the "reasonably prudent" internet user as one who is "not a complete stranger to computers," but has "some familiarity with how to navigate a website or download an app." *Edmundson*, 85 F.4th at 704. "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention." *Starke*, 913 F.3d at 289 (citing 22 N.Y. Jur. 2d Contracts § 29). A user will be deemed to have had inquiry notice of the relevant terms only if the terms "are presented in a clear and conspicuous way." *Edmundson*, 85 F.4th at 703; *see also Starke*, 913 F.3d at 289. Courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms."

---

[10] In *Edmundson*, the Second Circuit found that Connecticut Law applied but held that "traditional contract formation law does not vary meaningfully from state to state," and accordingly considered and applied "precedents determining the enforceability of arbitration provisions according to the contract-law principles of other states," including New York. *Edmundson*, 85 F.4th at 702–03.

*Edmundson*, 85 F.4th at 703 (citing *Starke*, 913 F.3d at 289) (brackets omitted). Courts consider the "totality of the circumstances" when determining whether a reasonably prudent user would have inquiry notice of the terms. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 842 (2d Cir. 2021).

The second requirement, unambiguous manifestation of assent to the contract's terms, "can be accomplished by words or silence, action or inaction, so long as the user intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Nicosia*, 834 F.3d at 232 (quotation marks and citations omitted). The Second Circuit has "distinguished web-based contracts" by "the manner in which the user manifests assent." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017). Some agreements, termed "clickwrap" or "click-through" agreements, "require users to click an 'I agree' box after being presented with a list of terms and conditions of use." *Id.* Conversely, agreements that "generally post terms and conditions on a website via a hyperlink at the bottom of the screen" and do not require an express manifestation of assent are referred to as "browsewrap agreements." *Id.* (quotation marks omitted). In the case of a browsewrap agreement, "there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." *Edmundson*, 85 F.4th at 704. But "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia*, 834 F.3d at 232.

To determine whether an offeree knew or should have known of the terms of a web-based contract such that they unambiguously manifested assent, courts consider the following factors: (1) "whether the interface clearly warned the user that taking a specific action would constitute

16

assent to certain terms"; (2) "whether notice of the contractual terms was presented to the consumer in a location on the interface and at time when the consumer would expect to receive such terms"; and (3) the "course of dealing between the parties, including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms." *Edmundson*, 85 F.4th at 704–05 (citations and quotation marks omitted).

In *Soliman*, the Second Circuit found that a Subway advertisement offering discounts to customers who texted a keyword to Subway failed to bind the plaintiff to a mandatory arbitration clause. 999 F.3d at 835.[11] The court considered an advertisement that read: "WANT SUBWAY DEALS SENT DIRECTLY TO YOUR PHONE?" *Id.* at 832. The middle of the advertisement featured text in smaller font, which stated: "TEXT OFFERS to 782929 (SUBWAY) TO START RECEIVING WEEKLY OFFERS." *Id.* In the bottom right corner of the advertisement was a block of text in a font much smaller than other text on the advertisement, which stated, on line two: "Terms and conditions at subway.com/subwayroot/TermsOfUse.aspx." *Id.*[12]

The Second Circuit found that this URL and reference to Subway's "[t]erms and conditions" was not reasonably conspicuous and that a reasonable consumer would not realize she was agreeing to be bound to those terms by texting Subway for several reasons. *Id.* at 840.

---

[11] The Second Circuit in *Soliman* applied California law, but explicitly noted that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." 999 F.3d at 834 n.4; *see also Edmundson*, 85 F.4th at 703 (noting that "traditional contract formation law does not vary meaningfully from state to state" and thus did "not limit" itself to the law of one state in analyzing the formation of the contract).

[12] In *Soliman*, the Second Circuit applied the same analysis to a print advertisement that courts apply to online advertisements. *Soliman*, 999 F.3d at 836.

First, the defendant failed to produce evidence of the size of the text on the advertisement, so the Second Circuit presumed that the size of the "terms and conditions" language favored the plaintiff's position, as the party opposing arbitration. *Id.* at 835. Second, the text referencing the "terms and conditions" was "not conspicuous in the context of the entire advertisement," but was instead "buried within a fine-print paragraph with over eighty other words," not highlighted by any color or emphasis, and was in text far smaller than the text used in the rest of the advertisement. *Id.* Third, the advertisement did not signal in any way that the customer opting to participate in the promotion by texting Subway was also agreeing to be bound by the terms and conditions and provided only an "obscure[ ]" reference to Subway's "terms and conditions." *Id.* at 836–38. Fourth, the Second Circuit found that the URL for the "terms and conditions" was not as accessible as a link on a website because the URL was printed on a physical advertisement and was not clickable. *Id.* at 839. Fifth, the document to which the URL linked stated that it was the terms of use "for this website," and did not explicitly state that the terms applied to the promotion participants. *Id.*

In another recent case involving a Subway promotional offer, *Arnaud v. Doctor's Associations Inc.*, the Second Circuit found that when a plaintiff entered his phone number on a promotional page of Subway's website and clicked a button labeled "I'M IN," he did not agree to be bound to the terms and conditions that were accessible via a hyperlink on that page. 821 F. App'x 54, 56–57 (2d Cir. 2020). The Second Circuit found that "[a] reasonable user would not find the terms and conditions link contained on the page to be conspicuous, since the link was at the bottom of the page, in relatively small font, and was introduced by no language other than the shorthand 'T & Cs.'" *Id.* at 56–57. Accordingly, the court found that "[a] reasonable user would

18

therefore not recognize that by clicking 'I'M IN,' he agreed to be bound by those terms and conditions." *Id.*

In *Starke*, the Second Circuit found that the plaintiff, who purchased an electronics protection plan through Amazon, did not have inquiry notice of contractual terms that were hyperlinked at the bottom of an email he received from Amazon following the purchase. 913 F.3d at 282, 292–93. The court found that the following factors weighed against a finding that the notice was reasonably conspicuous: (1) the seller never directed the plaintiff's attention to the hyperlink, (2) the email was cluttered with information that was not related to the plaintiff's purchase, (3) the "Terms & Conditions" hyperlink "appear[ed] without any language advising [plaintiff] to click on it," and (4) the terms were neither spatially nor temporally coupled with the transaction. *Id.* at 293. Finding a lack of inquiry notice, the court also concluded that the record failed to show that the plaintiff had unambiguously manifested assent to the contractual terms. *Id.* at 297.

By contrast, in *Meyer*, 868 F.3d 66, the Second Circuit found that Uber's smartphone application bound a user who signed up for an Uber account to a mandatory arbitration clause within Uber's "Terms of Service." [13] The Uber application presented a prospective user with a payment screen that contained the following elements: (1) a field at the top of the screen for the user to input a credit card number; (2) a button with the label "REGISTER"; (3) two additional buttons below the register button to connect to the user's pre-existing PayPal or Google Wallet account; and (4) text at the bottom of the screen against a white background which hyperlinked

---

[13] Like in *Soliman*, the Second Circuit in *Meyer* applied California law but noted that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Meyer*, 868 F.3d at 74; *see also supra* note 11.

to Uber's "Terms of Service" and stated that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Id.* at 77–78. The Second Circuit found that this screen provided the prospective user with inquiry notice for the following reasons: (1) the screen was "uncluttered"; (2) the text was "spatially coupled" with the registration button; (3) the entire screen—including the "terms and conditions" hyperlink—was visible at once; (4) the hyperlink was "temporally coupled" with the registration button—meaning that the customer was notified of the contract terms at the time of the sale; (5) and the screen included language that clearly signaled that the hyperlinked "Terms of Service" would apply if the customer registered for an Uber account. *Id.* at 79–80. The Second Circuit also found that the plaintiff unambiguously manifested assent to the terms by clicking the button to register for an account given the text stating that "[b]y creating an Uber account," the customer "agree[s]" to the terms and based on the temporal and spatial coupling of the "Terms of Service" hyperlink with the registration button. *Id.* at 79.

## II.    Application

Festival asserts that Rodriguez is bound by the Terms for two reasons. First, according to Festival, the webpages she navigated to purchase Splish Splash tickets contained reasonably conspicuous notice of the Terms. Second, Festival argues that Rodriguez unambiguously manifested assent to be bound by the Terms by completing her purchase through the website. (Def.'s Mot. at 12–14.)[14]

As an initial matter, Festival argues that the Terms were hyperlinked at the bottom of each of five separate webpages involved in the purchase process, which begins when the user

_____

[14] Defendant does not argue or put forth evidence that Rodriguez had actual notice of the Terms.

selects the type of Splish Splash ticket for purchase. (*Id.* at 5, 13.) Festival asserts that only one of these pages—the checkout page—appears in the Complaint. (*Id.* at 5, 13.) Festival appears to argue that the fact that the Terms appeared on five separate webpages involved in the ticket purchase process weighs in favor of a finding of inquiry notice. (*Id.* at 13.) But Festival has not placed in the record *any* images of *any* of the webpages involved in the process for purchasing Splish Splash tickets online. (*See* Def.'s Mot. at 5, 13 (citing Compl. ¶ 12)); *see generally id.*; Kim Affirm.; Def.'s Reply.) The Complaint includes three additional images of the Splish Splash website—the homepage, the Water Park Tickets page, and the Day Ticket selection page. (Compl. ¶¶ 9–11.) Festival does not argue that the image of the checkout page, or any of these other three images of the Splish Splash website included in the Complaint, are inaccurate. (Def.'s Mot.; Kim Affirm.; Def.'s Reply.)[15]

Festival has the burden to establish that an agreement to arbitrate exists, and I must draw all reasonable inferences in favor of the party opposing a motion to compel arbitration. *Starke*, 913 F.3d at 281 n.1. Given that there is only one webpage in the record with a hyperlink to Festival's terms, I therefore presume that Festival's Terms were only hyperlinked once during the Splish Splash day ticket purchase process, on that one page. *See Soliman*, 999 F.3d at 835

---

[15] The Complaint also includes an image of the webpage that allows the user to select the number of tickets for purchase, which follows from the user's selection of the type of ticket. (Compl. ¶ 11.) This webpage does not contain any "Terms&Conditions" hyperlink. (*Id.*) Festival does not argue that this page is one of the five pages of the purchase process or otherwise challenge the accuracy of this image. (*See* Def.'s Mot. at 5, 13.)

(presuming that the font size of a URL favored the plaintiff's position where the defendant did not produce any evidence of the font size); *see also* Compl. ¶ 12.[16]

Considering the Complaint and all of the evidence submitted in support of Festival's Motion, Festival has failed to establish that a reasonably prudent person seeking to purchase Splish Splash day tickets online would be on inquiry notice of the Terms of the ticket purchase agreement on the ticket purchase webpage, including the mandatory arbitration provision. Festival has also failed to show that Rodriguez unambiguously manifested assented to the Terms when purchasing her ticket.

     a. <u>Lack of Inquiry Notice of the Term's Arbitration Provision</u>

Although the design of the Splish Splash ticket purchase page contains some of the elements present in cases where a website placed the user on inquiry notice of hyperlinked terms and conditions, it ultimately fails to place a reasonably prudent user on notice of the Terms based on where the "Terms&Conditions" hyperlink is located on the page and the lack of text or any other signal calling attention to the link or informing the user that the "Terms&Conditions" apply to the ticket purchase.

The layout of the ticket purchase page is central to this analysis.[17] The checkout page is organized as follows: on the far-right side of the webpage is a vertical light grey rectangle that stretches the full height of the screen. Inside this grey rectangle is information relating to the

---

[16] Even if I presumed that there were four additional webpages involved in the ticket purchase process that displayed a hyperlink to Festival's Terms, I would have to presume that the hyperlink to the Terms on those webpages appeared exactly as the hyperlink to the Terms on the sole checkout page included in the Complaint. *Soliman*, 999 F.3d at 835. The presence of hyperlinks to the Terms on four additional webpages involved in the ticket purchase process, as opposed to just one, would not change my analysis as to whether Rodriguez was on inquiry notice of the Terms or whether Rodriguez manifested assent to the Terms.

[17] The ticket purchase page is reproduced *supra* Background Section I; *see also* Compl. ¶ 12.

ticket purchase including the total purchase price of the tickets, the breakdown of that total into

the ticket price and associated fees, and a field to input any promotional codes. The "Continue"

button is located at the very bottom of this grey rectangle. The rest of the page is distinct from

this far right rectangle for two primary reasons. First, the rest of the page has a white

background, separating the grey rectangle on the right side from the rest of the page. Second, in

the middle of the left side of the page, a rectangle features the following text in the largest letters

on the screen: "Upgrade to a Bronze Season Pass for as low as $40 more." That rectangle also

includes information about the blackout dates for the season pass. Below that text is another light

blue rectangle that provides the following hyperlinked terms: "Privacy Policy," "Operating

Rules," "Terms&Conditions," and "ADA Accessibility." Based on this layout, organization, and

formatting, it is not clear and conspicuous that the "Terms&Conditions" link is associated with

the act of purchasing a ticket through engagement with the material in the light grey rectangle on

the right-hand side of the page. Rather, this layout suggests that the "Terms&Conditions" relate

to the Bronze Season Pass or the use of the Splish Splash amusement park more generally.[18]

I recognize that, like the interface of Uber's smartphone application in *Meyer*, the Splish

Splash ticket checkout page is relatively "uncrowded." *See* Compl. ¶ 12; *Meyer*, 868 F.3d at 79;

*cf. Nicosia*, 834 F.3d at 238 (finding a webpage to be cluttered where it contained many links in

---

[18] For these reasons, the case on which Festival relies, *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024), is distinguishable. (Def.'s Mot. at 13.) In *Patrick*, the Ninth Circuit found that a hyperlink to terms and conditions of a purchase agreement provided the plaintiff with "reasonably conspicuous notice" of the terms contained within that hyperlink where the hyperlink appeared on the "final order review page, directly below key information such as the purchase total, and directly below the button [plaintiff] tapped to complete his purchase," which was labeled "Place Order." *Id.* at 477. Here, however, the "Terms&Conditions" hyperlink was not directly underneath the purchase price information or "Continue" button, but in a different part of the page underneath information that was not part of the user's purchase.

different colors, fonts, and locations as well as other advertisements and promotions). The design of the checkout page includes six separate rectangles, each with limited text in the same font, and the webpage is primarily white and grey with just a few colors. Further, the entire page, including the purchase price, the button labeled "Continue," and the "Terms&Conditions" hyperlink, is visible at once, without having to scroll to a different part of the screen. *Meyer*, 868 F.3d at 79; *cf. Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002) (declining to enforce terms where the link to the terms "would have become visible to plaintiffs only if they had scrolled down to the next screen"). And unlike in *Soliman*, the "Terms&Conditions" text is not substantially smaller than the rest of the text on the page, nor is it buried within a paragraph of text. 999 F.3d at 835. The "Terms&Conditions" hyperlink is also "temporally coupled" with the webpage where the user takes an action toward purchasing Splish Splash tickets, which also weighs in favor of finding reasonably conspicuous notice. *Meyer*, 868 F.3d at 78.

Despite these elements, the "Terms&Conditions" hyperlink fails to provide reasonably conspicuous notice of the Terms, including the mandatory arbitration provision, for two critical reasons.

First, unlike the notice in *Meyer*, where the "Terms of Service" hyperlink was located directly below the registration button, 868 F.3d at 81, the "Terms&Conditions" hyperlink on the Splish Splash ticket purchase page is visually separated from the portion of the webpage that displays the total purchase price of the tickets selected for purchase and the "Continue" button that must be clicked to move forward with a purchase. This layout makes it unclear that the "Terms&Conditions" hyperlink actually relates to the act of purchasing a ticket. *See* Compl. ¶ 12; *see also Starke*, 913 F.3d at 293 (finding that there was not reasonably conspicuous notice of terms within a "Terms & Conditions" hyperlink in part because the hyperlink appeared "after

several prompts unrelated to the enclosure of the contract"). In other words, the presentation of the Terms is not "directly adjacent" to the "Continue" button "so as to indicate that a user should construe clicking as acceptance" of the Terms. *Nicosia*, 834 F.3d at 236–37.

Second, like in *Starke*, *Soliman*, and *Arnaud*, the "Terms&Conditions" hyperlink is not accompanied by any other language that would indicate that, by proceeding with the transaction, the user is agreeing to the hyperlinked contractual terms. *Starke*, 913 F.3d at 293; *Soliman*, 999 F.3d 828; *Arnaud*, 821 F. App'x at 56–57; *cf. Meyer*, 868 F.3d at 77–78 (notice was clear and conspicuous where it included language stating that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE" and provided a hyperlink to the contractual terms referenced). Where a webpage does not require that a user expressly consent to certain terms of service, the Second Circuit has "emphasized the importance of clearly signaling to the consumer in some fashion that, by continuing with the transaction or by using a website, she will be agreeing to the terms contained in an accompanying hyperlink." *Soliman*, 999 F.3d at 837. As in *Soliman*, the mere reference to "Terms&Conditions" without "such language, or at least some other signal to the terms and conditions, further undermine[s] the conspicuousness of the notice" in this case. *Id.* at 838; *see also Starke*, 913 F.3d at 293 (finding that there was not reasonably conspicuous notice of terms and conditions where the email containing the hyperlinked terms "in no way signal[ed] to [plaintiff] that he should click on the link, and it [did] not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link"); *Arnaud*, 821 F. App'x at 56–57 (finding that "[a] reasonable user would not find the terms and

conditions link contained on the page to be conspicuous" where, among other things, it "was introduced by no language other than the shorthand 'T&Cs'").[19]

Accordingly, applying the Second Circuit's precedents to the facts in the record and considering the totality of the circumstances, Festival has failed to establish that Rodriguez was on inquiry notice of the Terms hyperlinked on the Splish Splash website, including the mandatory arbitration provision. *See Soliman*, 999 F.3d at 842 (considering the totality of the circumstances to determine whether the plaintiff was on inquiry notice).

   b.   Lack of Unambiguous Manifestation of Assent to the Term's Arbitration
        Provision

Festival has also failed to establish that Rodriguez unambiguously manifested her assent to the Terms, including any mandatory arbitration provision, by completing the purchase of tickets through the Splish Splash website. Specifically, considering the evidence in light of the three factors identified in *Edmundson*, Festival has not shown that Rodriguez "knew or should

---

[19] Festival also attempts to distinguish *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022). (Def.'s Mot. at 13–14.) In *Berman*, the Ninth Circuit found that a web user could not be forced to arbitrate claims based on a hyperlink to terms and conditions, including a mandatory arbitration clause, that was displayed on the website plaintiff used because the hyperlink did not provide reasonably conspicuous notice of the terms. *Berman*, 30 F.4th at 856–58. Defendant points out that, unlike here, the hyperlink to the terms in *Berman* was in a font "so small that it [was] barely legible to the naked eye," and was "considerably smaller" than the rest of the webpage's font. Def.'s Mot. at 13–14; *Berman*, 30 F.4th at 856–57. Critically, however, the Ninth Circuit also found that the hyperlink did not sufficiently notify the user of the legal significance of the user's actions because it did not include language such as "[b]y clicking the Continue >> button, you agree to the Terms & Conditions." *Berman*, 30 F.4th at 858. The standards in the Ninth Circuit regarding web-based contract formation as articulated in *Berman* are similar to, although not exactly the same as, those in the Second Circuit. *See id.* at 855–58. To the extent *Berman* applies, I find that even though the hyperlink in this case was not in considerably smaller font than the rest of the text on the checkout page, the layout, formatting, and text on the page suffer from numerous deficiencies that deprived Rodriguez of inquiry notice, including the fact that the ticket purchase webpage failed to provide any textual notice or other signal that by clicking "Continue," the user would agree to the Festival's Terms.

have known of" the Terms and that she "understood that acceptance of the benefit" would be construed by Festival as an agreement to be bound by those Terms. *Edmundson*, 85 F.4th at 704.

First, the "Terms&Conditions" hyperlink did not contain any text or visual signal that "clearly warned" Rodriguez that clicking the "Continue" button and proceeding with her ticket purchase "would constitute assent" to the Terms. *Id.*; *see also Starke*, 913 F.3d at 289 (finding lack of unambiguous manifestation of assent to be bound to terms where the seller never directed the plaintiff's attention to the "Terms & Conditions" hyperlink and the hyperlink "appear[ed] without any language advising [plaintiff] to click on it"); *supra* Discussion Section II(a).

The second factor—whether the hyperlinked terms were "presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms"—also weighs against a finding of unambiguously manifested assent. *Edmundson*, 85 F.4th at 704–05. While the "Terms&Conditions" hyperlink was displayed at the time a user would expect, when the total purchase price appeared and the user must select "Continue" to proceed with the transaction, the hyperlink was not presented to the user in an expected location on the interface because it was not located directly next to, above, or below the button Rodriguez had to click to continue with the purchase of Splish Splash tickets. *See Nicosia*, 834 F.3d at 236 (finding no "manifest[ation] [of] assent" to terms where "the presentation of terms [was] not directly adjacent to the . . . button so as to indicate that a user should construe clicking as acceptance"); *Starke*, 913 F.3d at 293 (no manifestation of assent where the terms were neither spatially nor temporally coupled with the transaction on the webpage).

Third, while courts also consider the "course of dealing between parties" in analyzing whether a party manifested assent to terms, there is no evidence in this record of any course of prior dealings between the parties. *Edmundson*, 85 F.4th at 705. Thus, none of the factors

identified in *Edmundson* show that clicking the "Continue" button was a manifestation of assent "sufficiently definite to assure that the parties [were] truly in agreement with respect to all material terms." *Starke*, 913 F.3d at 289.

Accordingly, there are two independent bases for finding that the arbitration provision located in the "Terms&Conditions" that are accessible via a hyperlink on the Splish Splash ticket purchase webpage is not binding on Rodriguez. The record demonstrates a lack of inquiry notice that a reasonably prudent person would be bound by the Terms if they continued with a ticket purchase and the record does not show that Rodriguez unambiguously manifested assent to be bound to the Terms when she purchased tickets. Therefore, Rodriguez's putative CAFA claim under Section 25.07 of the New York Arts and Cultural Affairs Law is not subject to mandatory arbitration on an individual basis pursuant to the arbitration clause contained in the "Terms&Conditions" on the Splish Splash ticket purchase webpage.

## CONCLUSION

For the reasons set forth above, Festival's Motion to Compel Arbitration (ECF No. 6) is denied.


Dated:  Central Islip, New York
        January 27, 2025


                            */s/ Nusrat J. Choudhury*
                            NUSRAT J. CHOUDHURY
                            United States District Judge